1

Vol II
1 - 63

IN THE UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS


DAVID F. POEHLER,                    )
        Plaintiff,               ) DOCKET NO.
-v-                                  ) 04CV30254-MAP
                                     ) 04CV30192-MAP
UNITED STATES Postal Service,        )
        Defendant.               )


        THE ORAL DEPOSITION OF DAVID F. POEHLER, held

pursuant to Notice, and the applicable provisions of the

Federal Rules of Civil Procedure, before Jody Perkins,

a Court Reporter and Notary Public, within and for the

Commonwealth of Massachusetts, at the offices of the

United States Attorney, 1550 Main Street,

Springfield, Massachusetts, on Friday, January 20, 2006,

commencing at 10:15 a.m.


ORIGINAL

APEX Reporting
(617) 426-3077

1   A   Four, I believe, yes.

2   Q   And how are you able to date it as being March; what

3       makes you say that you learned about it in March?

4   A   Because when I got the paperwork from Neal's office,

5       okay, I looked at it.  I went back to my EEO rep, and

6       he says it's over the time limit.

7   Q   What--

8   A   It should have been done within 90 days of the appeal.

9   Q   What paperwork did you get from Neal's office; did you

10      get a copy of that--

11  A   Yes--

12  Q   --decision?

13  A   Yes.  I got a copy of that decision which I couldn't

14      get on my own.  That's why I went to Neal's office.

15  Q   And did Richard Neal's office give that to you along

16      with a letter; did they send that decision to you with

17      a cover letter?

18  A   Yes.

19  Q   And maybe if we take a break, would that cover letter

20      be in this package of, of materials that you produced

21      to your lawyer?

22  A   I, I have no idea.

23  Q   Okay.  Picking up with the lawsuit that is marked as

24      Exhibit 4, in your--

25          MR. PIKULA:  May I have just the--

*APEX Reporting*
(617) 426-3077

| | | |
|---|---|---|
| 1 | Q | The EEO complaint that you filed that we talked about a |
| 2 | | little earlier with respect to the supervisor position, |
| 3 | | that wasn't against Mr. Hearn; was it? |
| 4 | A | Excuse me.  Could you repeat that? |
| 5 | Q | The EEO complaint you filed that is marked as |
| 6 | | Exhibit 1, which related to the Susan Bowes situation, |
| 7 | | who was the discriminating official in that complaint? |
| 8 | A | That was Robert Koestner I had filed. |
| 9 | Q | So none of these four individuals that we're talking |
| 10 | | about were named in that EEO complaint; were they? |
| 11 | A | No. |
| 12 | Q | And as you sit here today, can you think of any EEO |
| 13 | | complaint you had filed against Mr. Hearn before March |
| 14 | | of 2001? |
| 15 | A | No. |
| 16 | Q | And you said that you also thought that this notice of |
| 17 | | proposed removal was based on discrimination because of |
| 18 | | your mental disability.  What makes you believe that; |
| 19 | | why do you believe that? |
| 20 | A | I got passed over for -- when I went back in '97-- |
| 21 | Q | Let's, we're, let's stick with this March 15, 2001, |
| 22 | | notice of removal.  What makes you believe that the |
| 23 | | notice of removal was based on any type of disability |
| 24 | | that you suffered? |
| 25 | A | Because I wasn't at work.  I was out on disability for |

```
 1        my condition, so they were, they figured it's probably
 2        easier just to remove me.  That's why I feel, I feel
 3        that because of my disability, I was being removed.
 4   Q    Did anybody say anything to you that made you believe
 5        that it was because of your disability?
 6   A    No.  Everything was done by paperwork.
 7   Q    Was there any paperwork that you received or that you
 8        had, any paperwork that you received that leads you to
 9        believe that this notice of proposed removal was based
10        on your disability?
11             MR. PIKULA:  Objection to form.
12   A    No.
13   Q    Now, you filed a grievance about the notice of removal;
14        is that right?
15   A    Yes.
16   Q    And as a result of the grievance, it was reduced to a
17        seven day suspension?
18   A    Yes, and that was also reduced.
19   Q    And the seven day suspension was held in abeyance based
20        on, as long as you didn't, as long as you weren't
21        absent for more than three days in a 90 day period;
22        does that--
23   A    Yes--
24   Q    --sound right?  So you didn't lose any pay as a result
25        of this notice of removal; is that fair to say?
```

APEX Reporting
(617) 426-3077

```
 1   A    No.

 2   Q    And did you lose any pay as a result of the suspension

 3        that was held in abeyance?

 4   A    No.

 5   Q    If we go back to Exhibit No. 8, and if you turn to

 6        Page 4 of it, it's what's listed as your second

 7        complaint being the July 18th suspension; do you see

 8        that?

 9   A    July 18th?

10   Q    Right, July 18, 2001, suspension, seven day suspension;

11        correct?

12   A    (No verbal response.)

13   Q    That's the second complaint that's addressed in this

14        34-01 complaint; is that right?

15   A    Yes.

16   Q    And this was the suspension, it was, it was invoked

17        because you had had a previous agreement that, if you

18        didn't miss more than three days, that you wouldn't

19        have any suspension, you had agreed to that; is that

20        correct?

21   A    Yes.

22   Q    And then the, you, in fact, you did miss more than

23        three days?

24   A    Yes.

25   Q    And so based on the agreement, this suspension was then
```

```
 1           invoked; is that how it went?
 2    A      Yes.
 3    Q      What's, do you believe that there was anything
 4           discriminatory about invoking this 07/18/01 suspension?
 5    A      No.
 6              (Pause.)
 7              I went on -- beyond the three days of the
 8           agreement, part and whole, or the 90 days, that's my
 9           disability.  I, I, you know, I had problems standing
10           at, sitting at work over eight hours or up to eight
11           hours.
12    Q      Was there anything discriminatory about the Postal
13           Service invoking this seven day suspension because you
14           had, essentially, because you had missed more than
15           three days in three months; was there anything
16           discriminatory about that action?
17              MR. PIKULA:  Objection to form.
18              MS. GOODWIN:  What's the problem with the form?
19              MR. PIKULA:  I think you seem to be asking about
20           all of his subjective beliefs, and I, I don't even know
21           if that's admissible.
22              MS. GOODWIN:  Well, I guess--
23              MR. PIKULA:  I mean, there are certainly
24           inferences that can be drawn from this, but I don't
25           know that, whether--
```

1        MS. GOODWIN:  Okay.  Well--

2        MR. PIKULA:  You know, but maybe in a different

3    form you could ask it.  I don't know, but you're

4    certainly entitled to explore.  I'm not trying to say

5    that you--

6        MS. GOODWIN:  But I just wanted to know what the

7    matter with the question is.  I think I'm going to

8    stick with the question--

9        MR. PIKULA:  Yes, no, sure--

10       BY MS. GOODWIN:

11   Q   What is, what, do you believe that this 07/18/01

12       suspension was motivated by any discrimination on the

13       part of the Postal Service?

14   A   That's, that's, for me, it's hard to answer directly

15       because -- and the reason for that is, is because I

16       know these people.  It's, I have to say I can't prove

17       that.

18   Q   Do you have any evidence that you can point to?

19   A   No.

20   Q   Turning to the next one, Item 3, August 30, 2001, you,

21       you're complaining here, if I'm understanding it

22       correctly, about a comment Mr. Hearn made--

23   A   Yes--

24   Q   --to you?  And is there anything more to the comment

25       other than what's reflected here in Exhibit 8?

*APEX Reporting*
(617) 426-3077

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What else was not, what's not in Exhibit 8 that |
| 3 | | concerns this comment? |
| 4 | A | He had, he had, after he had said to me, thanks a lot |
| 5 | | for filing an EEO against me, I said, look, I'm just |
| 6 | | exercising my rights, he said, well, you make me look |
| 7 | | bad in front of my superiors. |
| 8 | Q | And-- |
| 9 | A | You know, and I said, well, that's not my problem, I |
| 10 | | mean, if you want to go by the rules, you know. |
| 11 | Q | And anything, anything else in terms of that |
| 12 | | conversation? |
| 13 | A | Oh, I, I just felt that, you know, it wasn't over with |
| 14 | | him anyway, you know. |
| 15 | Q | Did you get along with Mr. Hearn? |
| 16 | A | Yes.  In fact, he's, he was married to my cousin. |
| 17 | Q | And at this, at this time, did you get along with |
| 18 | | Mr. Hearn; in this time frame in the summer of 2001, |
| 19 | | would you consider him somebody who you got along with? |
| 20 | A | Yeah.  I worked for him. |
| 21 | Q | And did you continue to work for him after August 30th |
| 22 | | of 2001? |
| 23 | A | No.  In fact, I asked him if he needed any, any, any |
| 24 | | supervisors, and he had told me, no, he's all set, and |
| 25 | | then I responded with, well, it's not for me, it's |

```
 1        somebody wants to know if they could be an actor, and
 2        his response was, oh, yeah, just have them fill out a
 3        buck slip and come on, come on right in.
 4             So I had to take it that I wasn't going to be an
 5        actor for him anymore, but somebody else could be.
 6   Q    Who, who were you working, who was your supervisor
 7        around August 30, 2001?
 8   A    Had to be, I believe it was Al Hearn.
 9   Q    And when did, when did he stop being your supervisor?
10   A    He stopped being my supervisor about two, two or three
11        years ago when I lost my bid job, and I went over to
12        the Far East where I was under MDO Lee Kopacz.
13   Q    So for the rest of 2001, he was your supervisor?
14   A    Yes.
15   Q    And was he, did he continue to be your supervisor in
16        2002?
17   A    Yes, I believe so.
18   Q    And did you, aside from this issue of him not making
19        you an acting supervisor, did you get along with him in
20        the workplace?
21   A    I, I just didn't have any contact with him.
22   Q    So although he was your supervisor, you didn't have any
23        contact with him?
24   A    I, I was on the other side.  I went on the other side
25        of the building under -- my psychiatrist wrote a
```

32

1      statement stating I should be out of that work

2      environment or excluded from, from him and Mark Sales,

3      so they put me on the other side of the building.

4  Q   And when did that occur?

5  A   Around 2002, 2003, somewhere around there.

6  Q   Before you moved, you were working under Al Hearn?

7  A   Yes.

8  Q   Going to the next page, which is Item 4, you indicate

9      that you're complaining about your denial of overtime

10     and holiday work pay on Labor Day weekend 2001; do you

11     see that?

12 A   Yes.

13 Q   Is it fair to say that you, initially, did not want to

14     work on the Labor Day weekend?

15 A   Yes.

16 Q   That you had plans?

17 A   Yes.

18 Q   And is it also fair to say that you did, you were not

19     required to work on the Labor Day weekend?

20 A   Yes.

21 Q   So what's the problem?

22 A   The problem was that I had asked Mr. Hearn if I could

23     have that weekend off because I was going to go visit

24     my son down in Carolina.

25         He said, not a problem.

*APEX Reporting*
(617) 426-3077

33

1      I said, well, I want to let you know so I don't

2    get scheduled and get disciplined for it.

3      He said, not, don't worry about it.\Then it came

4    in the order books showing that I was forced to work

5    the holiday, so I had asked him, Al, what about me not

6    working?

7      He says, don't come in.

8      I said, well, if I don't come in, I'll get

9    disciplined.

10      He said, well, that's how it works.

11      And then I said, well, I don't need any more

12    discipline, I'll be in.  And then I went in the

13    cafeteria, and I said, well, if I got to work my

14    holiday, I want to work my days off.

15      He says, you can't because it's already in the

16    order book, and you didn't, you didn't volunteer to

17    work your days off.  So at the last minute, that

18    Thursday night, I believe it was Thursday or Friday, I

19    got a call from the post office on my answering machine

20    saying I didn't have to show up for work, I didn't have

21    -- I wasn't forced on the holiday, so I didn't come in.

22      When I came in on that Monday, or the next day

23    that I did--

24 Q  Would that be Tues -- the holiday was on a Monday--

25 A  Monday.  Tuesday, when I did show up for work, I found

**APEX Reporting**
(617) 426-3077

```
 1        out that there were several other individuals that were

 2        forced with me that also weren't forced, but they came

 3        in anyway, and while they were at work, they were asked

 4        to work their days off, and he had told me because I

 5        didn't request it in the beginning, it's written in

 6        stone I cannot come in, so I had filed an E -- I filed

 7        a union grievance.

 8   Q    But -- withdraw that.

 9   A    I was treated different.  They allowed people to work.

10   Q    You, and you ended up not being required to work--

11   A    Right--

12   Q    --Labor Day weekend at all; correct?

13   A    Right.

14   Q    And that's what you, initially, had wanted?

15   A    Right.  But I also requested, if I had to work, that

16        I'd work my days off, and he told me I couldn't.

17   Q    If you turn three pages, four pages in, there's a

18        second, further on, there's a second affidavit which is

19        dated about a year later, which is also part of this

20        34-01 complaint, and it relates to a 14 day suspension;

21        do you see that?

22            (Pause while witness reviews document.)

23   A    I don't see where it says 14 day.

24   Q    Right here.

25   A    Oh, okay, I see it now, 14 days, yup.
```

*APEX Reporting*
(617) 426-3077

35

| | | |
|---|---|---|
| 1 | Q | Do you recall that 14 day-- |
| 2 | A | Yes-- |
| 3 | Q | --suspension?  And what was the reason that you were |
| 4 | | given for that 14 day suspension? |
| 5 | A | Failure to be regular in attendance. |
| 6 | Q | And had you failed to be regular in attendance? |
| 7 | A | Yes. |
| 8 | Q | And what evidence do you have that this 14 day |
| 9 | | suspension was imposed in retaliation for you having |
| 10 | | filed earlier EEO complaints? |
| 11 | | (Pause.) |
| 12 | A | Because of the way I was treated.  My depression got |
| 13 | | worse.  I got, you know, I was on medication, and there |
| 14 | | were times that I just couldn't function at work. |
| 15 | Q | And, and what, what evidence do you have that the |
| 16 | | suspension was imposed in retaliation for you having |
| 17 | | filed EEO complaints in the past? |
| 18 | A | I can't honestly answer that. |
| 19 | Q | Why can't you answer that? |
| 20 | A | All I can say is because of my condition, they just |
| 21 | | kept riding me.  I took time off from work because I |
| 22 | | was depressed because of what I was going through to, |
| 23 | | to work, and then they just kept, one thing after |
| 24 | | another, you know.  It was, to me, it was like a |
| 25 | | nonstop bombardment on me. |

36

1        I felt they were retaliating, you know, trying to

2        get the best of me while I was in a weak state by being

3        out of work because of my condition.

4   Q    Do you have evidence of other individuals who had

5        similar absenteeism who did not receive any discipline?

6   A    Not at this moment.  I'm sure there is.

7   Q    But as you're sitting here today, you don't have that

8        evidence?

9        (Pause.)

10       Let me, let me withdraw the question and ask it in

11       a different way.  Let's mark this as exhibit, whatever

12       we're up to, No. 9.

13                          (The document referred to was

14                          marked for identification as

15                          Poehler Exhibit No. 9.)

16       BY MS. GOODWIN:

17  Q    I'm showing you what's Exhibit 9, which are your

18       responses to the government's request for production in

19       this particular lawsuit, which is 30254; do you see

20       that, do you recognize that as your responses to

21       production which were served along with a number of

22       different documents?

23       (Pause while witness reviews document.)

24  A    Yes.

25  Q    And you were asked in that request for production to

37

```
1        produce the evidence that you had that supports your
2        claim of discrimination; is that right, in Request
3        No. 2?
4    A   Yes.
5    Q   And is it fair to say that the documents you produced
6        were the documents that constitute the evidence that
7        you have supporting your claim of discrimination?
8    A   Yes.
9    Q   Is there any other evidence that you're aware of that
10       was not produced to the government in response to this
11       request for production?
12   A   No.  I mean, there are other individuals that, that
13       have taken off without medical documentation, whatever,
14       and they're still working for the post office with no
15       repercussions.
16   Q   And did you provide the government with evidence about
17       those individuals?
18   A   No.
19   Q   Do you have evidence concerning those individuals at
20       home?
21   A   No.
22   Q   Okay.  I want to shift gears -- just one moment.
23           (Pause.)
24           In, see if I can keep these straight, just going
25       back, just for a minute, to--
```

**APEX Reporting**
(617) 426-3077

38

```
 1          COURT REPORTER:  Exhibit 6.

 2          MS. GOODWIN:  The interrogatories?

 3          COURT REPORTER:  Yes.

 4          MS. GOODWIN:  I'm trying to find the actually

 5     marked exhibit.

 6          MR. PIKULA:  Oh.

 7          MS. GOODWIN:  Do you have it?

 8          MR. PIKULA:  I can't explain it.  I'm sorry.

 9          BY MS. GOODWIN:

10  Q    Just going back to Exhibit 6 for a minute, when you're

11       asked in Question 1 what the basis of your claim of

12       discrimination is, if you go on to Page 2, you indicate

13       towards the bottom that this case is also an appeal

14       from a final decision dated November 1, 2004,

15       concerning a trans -- denial of a transfer to a

16       custodial position; do you see that?

17  A    Yes.

18  Q    Do you mention anything in your lawsuit about this

19       denial of the transfer to a custodial position?  I can

20       show you your lawsuit.

21          (Pause.)

22  A    If I remember, this was the third lawsuit or the

23       second.  I've filed two or three of them.

24  Q    Are you aware, do you have a lawsuit that references

25       the transfer to the custodial, the denial of the
```

| | | |
|---|---|---|
| 1 | | transfer? |
| 2 | A | I don't remember. |
| 3 | Q | What was discriminatory about the denial -- well, |
| 4 | | withdraw that.  Who denied you the transfer to the |
| 5 | | custodial position? |
| 6 | A | I believe his name is Wentzel.  I don't remember his |
| 7 | | first name.  His last name is Wentzel. |
| 8 | Q | And had you ever filed an EEO complaint against him |
| 9 | | prior to this? |
| 10 | A | No. |
| 11 | Q | And when you filed your EEO complaint about this, was |
| 12 | | he the discriminating official who you named? |
| 13 | A | Yes, I believe so. |
| 14 | Q | And do you believe that his decision to deny you the |
| 15 | | transfer was discriminatory? |
| 16 | A | Yes. |
| 17 | Q | And why do you believe it was discriminatory? |
| 18 | A | Because the letter he sent me denying me, the letter, |
| 19 | | in general, stated that, I believe we have that, too, |
| 20 | | about my past performance at the post office, you know. |
| 21 | | They way it was generalized, it didn't, he didn't say I |
| 22 | | didn't get the job because of my disability. |
| 23 | | He didn't say I didn't get the job because of my |
| 24 | | sick leave or anything like that.  It was general that, |
| 25 | | you know, I didn't get the job.  It was general, and so |

40

```
 1        I filed on it, and -- I filed an EEO on, on his
 2        decision.
 3   Q    Do you think that he denied you the transfer to a
 4        custodial position because of your disability?
 5   A    Yes.
 6   Q    And why do you think that?
 7   A    Because I told him my dis -- I told him my disability.
 8   Q    And why do you think that that's what motivated him not
 9        to give you the job?
10   A    Well, because he told me part of the job entails
11        climbing ladders and carrying bags of salt and, you
12        know, running a lawn mower and driving a snow blower,
13        you know, stuff like that that might be too strenuous.
14   Q    And is that type of work, are you physically able to do
15        those, that type of physical labor?
16   A    No, but there's other, other work that I could do in
17        the custodial craft.  There are people in the custodial
18        craft on limited and light duty.
19   Q    Other than the fact that he described this work as
20        requiring certain type of strenuous manual labor, is
21        there any other basis for your belief that his decision
22        not to give you the job was motivated by
23        discrimination?
24   A    Yeah.  He, he had hired a, well, another employee that
25        was a clerk and is now, went into the custodial craft
```

*APEX Reporting*
(617) 426-3077

41

1      who was much younger than I am, probably in his

2      twenties, early thirties, and I feel that, you know,

3      coupled with my physical being, he just took a younger

4      person.

5   Q   So what type of discrimination is involved in this not

6      getting the transfer to the custodial position, in your

7      opinion?

8   A   In my opinion, I, like I said, he generalized.  He

9      didn't, he didn't give me a specific reason.

10  Q   But is it your belief that he was discriminating

11     against you based on age?

12  A   Age and, and ability.

13  Q   Age and what type of ability?

14  A   Because of my disability, ability not to climb ladders

15     or.

16  Q   And the evidence that you have that it was based on age

17     is, is the fact that a younger person got the job?

18  A   Yes.

19  Q   And who's this younger person who got the job?

20  A   I can't think of his name offhand.  I believe his, his

21     first name is Bob.  I can't think of his last.  He was

22     also, he's also a union steward or he was a union

23     steward.  I can get his name for you though.

24  Q   And, and with respect to this transfer to the custodial

25     job, are you claiming that it was, that it was, that

*APEX Reporting*
(617) 426-3077

42

1        you didn't get the transfer because you were being

2        retaliated against for past EEO complaints?

3    A   Yes.  I felt that, that I didn't get it because of

4        that, past EEO complaints.

5    Q   Did this individual -- how do you spell his last name?

6        Wentzel?

7    A   Wentzel?

8    Q   Do you know?

9    A   W-E-N-T-Z-E-L, I think.

10   Q   And did Mr. Wentzel know that you had filed previous

11       EEO complaints?

12   A   No.

13   Q   Then what makes you believe he was retaliating against

14       you for filing EEO complaints?

15   A   The generalization of his letter that I received.

16           MS. GOODWIN:  I'm going to go now to the other

17       lawsuit, which is 192, and the complaint is marked as

18       Exhibit 5, and I'm going to mark as Exhibit 10 your

19       interrogatory responses, and I don't think I made an

20       extra copy.

21                          (The document referred to was

22                          marked for identification as

23                          Poehler Exhibit No. 10.)

24           BY MS. GOODWIN:

25   Q   Would it be accurate to say that your, the complaints

*APEX Reporting*
(617) 426-3077

43

```
 1        that you're making in this case 192 are summarized in
 2        your response to Interrogatory 1, which is Exhibit 10?
 3              (Pause.)
 4              THE WITNESS:  I'm lost here.
 5              MS. GOODWIN:  Did I mess up?
 6              MR. PIKULA:  No.
 7              (Witness and attorney confer.)
 8   A    All right.  Yup, I see it.
 9   Q    Does Exhibit 10, your answer to No. 1 on Exhibit 10,
10        these interrogatory responses, basically, summarizes
11        what your complaints are in this particular lawsuit?
12   A    Yes.
13   Q    I want to kind of take them one by one, if we can.  The
14        first one is what; what's the first thing you're
15        complaining about in this lawsuit?
16   A    Well, based on my physical and emotional and
17        retaliation for filing these complaints.
18   Q    Let me rephrase the question.  Is it, is it fair to say
19        that the first thing or one of the things that you're
20        complaining about in this lawsuit has to do with not
21        being made whole after recision of a February 9, 2002,
22        letter of removal?
23   A    Yes.
24   Q    So if I understand it correctly, there was, you were
25        going to be removed from the post office, but they rec
```

APEX Reporting
(617) 426-3077

| | | |
|---|---|---|
| 1 | | -- they took that back.  They rescinded it? |
| 2 | A | Right. |
| 3 | Q | And you feel that you were not made whole? |
| 4 | A | Right. |
| 5 | Q | How were you not made whole? |
| 6 | A | Well, the rescinded the letter, but it didn't mean that |
| 7 | | I was made whole by going back to square one, in other |
| 8 | | words, with no disciplinary action against me. |
| 9 | Q | So what was the, what was the effect; what was the |
| 10 | | adverse effect on you of this recision of the letter of |
| 11 | | removal? |
| 12 | A | That I wanted to be made whole so it wouldn't stay on |
| 13 | | my record. |
| 14 | Q | And what, what did it take to make you whole?  The |
| 15 | | letter was rescinded; correct? |
| 16 | A | Right. |
| 17 | Q | That means the letter was withdrawn; right? |
| 18 | A | The letter was withdrawn, but I needed, I filed a union |
| 19 | | grievance which later they sent me a letter saying that |
| 20 | | I was made whole with no repercussions of removal and |
| 21 | | suspension and all that.  In other words, I was made |
| 22 | | whole. |
| 23 | | But at first, when they rescinded it, there was |
| 24 | | noth -- they just said they were rescinding it, but I |
| 25 | | wanted to be made whole so there would be nothing in my |

45

```
 1        record showing that, well, we started with A, we got up

 2        to C, we'll get rid of you -- well, we're not going to

 3        get rid of you, but we're going to stay here at B, so

 4        next time you do something, we can just, you know what

 5        I mean, go to the next disciplinary action.

 6             I wanted to be whole, so I filed a grievance, and

 7        they had sent me a letter.

 8    Q   So were you made whole?

 9    A   Yes, I was made whole under, under a union grievance,

10        not under EEO.

11    Q   And I'm just having a little difficulty understanding

12        what about the recision didn't make you whole in the

13        first instance?

14    A   (No verbal response.)

15    Q   Why did, there was a letter of removal.  Does a

16        recision mean that the letter of removal is, basically,

17        reversed?

18    A   Right, rescinded or reversed.

19    Q   So why didn't that make you whole; what was the problem

20        with that?

21    A   Because I had gone to, gone to the EEO level on this

22        issue, and I was made whole at, at the grievance level.

23    Q   What I'm trying to do is go back before you filed your

24        grievance, after the letter was rescinded.  What didn't

25        make, what wasn't making you whole?  If the letter is
```

*APEX Reporting*
(617) 426-3077

46

```
1        taken away, what isn't making, why aren't you made
2        whole by that?
3    A   I was made whole from the letter from--
4    Q   No.  I don't want to go that far.  Let's put ourselves
5        in the position where we are when you filed your EEO
6        complaint?
7    A   Yeah.
8    Q   This 02/09/02 letter of removal was rescinded as of the
9        time you filed the EEO complaint; correct?
10   A   Right.
11   Q   So you weren't complaining to EEO about being removed.
12       You were complaining to EEO about the recision of the
13       removal; correct?
14   A   Right.
15   Q   What was the problem with the recision of the removal
16       that caused you to go to EEO?
17   A   The first part of that decision was they, they
18       rescinded it, but they didn't make me whole.
19   Q   Well, that's what I'm trying to get--
20   A   Yeah--
21   Q   --at.  Why didn't that make you whole, if they
22       rescinded it?
23   A   Because I wanted a letter.  I wanted an actual letter
24       saying that I was made whole, and they didn't give me
25       it.
```

1    Q    That used those words "made whole"?

2    A    Right.

3    Q    Who was responsible for making the decision about the

4         recision of removal?

5    A    I don't know.  Who was ever up --

6    Q    Who was discriminating against you and not making you

7         whole with the recision of removal?

8    A    Actually, I believe it would be Al Hearn.  He was my

9         MDO.

10   Q    And he was, was he retaliating against you?

11   A    I don't think so.

12   Q    Was he discriminating against you based on your age in

13        connection with this--

14   A    This--

15   Q    --specific thing?

16   A    No.

17   Q    Was he discriminating against you based on a

18        disability, again, just with respect to this decision?

19   A    No.

20   Q    The, the next part of this particular lawsuit, if you

21        look back to the interrogatory responses, I believe,

22        concerns a request for sick leave being denied on

23        January 12th; is that right?

24   A    Yes.

25   Q    And who denied that request for sick leave?

*APEX Reporting*
(617) 426-3077

48

| | | |
|---|---|---|
| 1 | A | Jay Penna. |
| 2 | Q | And was Jay Penna retaliating against you when he |
| 3 | | denied the request for sick leave? |
| 4 | A | No. |
| 5 | Q | And was he discriminating against you based on your |
| 6 | | disability when, or your claimed disability when he |
| 7 | | denied your request for sick leave? |
| 8 | A | No. |
| 9 | Q | Was he discriminating against you on any basis when he |
| 10 | | denied the request for sick leave? |
| 11 | A | Yes, I believe so. |
| 12 | Q | What basis? |
| 13 | A | On the basis that I had sick leave to use, and he |
| 14 | | denied me it because of the proposed removal. |
| 15 | Q | You're going to have to explain.  I'm not following |
| 16 | | you. |
| 17 | A | Because they were trying to remove me.  Okay.  I wanted |
| 18 | | to use my sick leave because of my condition, and I was |
| 19 | | denied the sick leave, although I had sick leave |
| 20 | | available, I was denied sick leave, and the reason they |
| 21 | | put on the form was denied, disapproved sick leave, |
| 22 | | proposed removal. |
| 23 | Q | And, and-- |
| 24 | A | That's all-- |
| 25 | Q | --do you believe that the reason he denied you the sick |

*APEX Reporting*
(617) 426-3077

49

| | | |
|---|---|---|
| 1 | | leave was because that you had a removal pending? |
| 2 | A | Yes. |
| 3 | Q | I think the third item -- do you mind if I just look |
| 4 | | over your shoulder here -- the third item was not being |
| 5 | | able to work, not being allowed to work from |
| 6 | | January 31, 2002, to February 14, 2002; is that fair to |
| 7 | | say, that's-- |
| 8 | A | Yes-- |
| 9 | Q | --the third item?  And who was responsible for not |
| 10 | | allowing you to work during that period? |
| 11 | A | Al Hearn. |
| 12 | Q | And was he retaliating against you for prior EEO |
| 13 | | complaints in not letting you work during that period? |
| 14 | A | Yes. |
| 15 | Q | And what makes you believe that he was retaliating |
| 16 | | against you in not letting you work? |
| 17 | A | Because when I was ready to come back to work, and I |
| 18 | | had all that documentation, he, he gave me a date when |
| 19 | | I could come back to work instead of letting me come |
| 20 | | back right away, so I believe it was because of the way |
| 21 | | that, in the past, how I had filed grievances against |
| 22 | | him or EEO against him. |
| 23 | Q | He let you come back? |
| 24 | A | Right, but-- |
| 25 | Q | But he gave you a date that you weren't happy with? |

50

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | And you believe the reason he gave you that date was |
| 3 | | because he was retaliating against you? |
| 4 | A | Right. |
| 5 | Q | Am I following you? |
| 6 | A | Right. |
| 7 | Q | Okay.  And what evidence do you have that he was |
| 8 | | motivated by retaliation in not letting you return |
| 9 | | earlier? |
| 10 | A | I don't, I don't have, I don't have an answer for that. |
| 11 | Q | Does that mean that you don't have any evidence that |
| 12 | | you can think of? |
| 13 | A | I don't have any, no-- |
| 14 | | MR. PIKULA:  Objection to form. |
| 15 | | BY MS. GOODWIN: |
| 16 | Q | When I say "evidence," I'm talking about it broadly, |
| 17 | | whether it be physical evidence or statements-- |
| 18 | A | Right-- |
| 19 | Q | --of individuals, any type of evidence-- |
| 20 | A | Right, no, I understand.  Yeah, no. |
| 21 | Q | And you don't have any as you're sitting here today? |
| 22 | A | Right. |
| 23 | Q | And did you believe that his decision not to let you |
| 24 | | come back earlier was based on discrimination because |
| 25 | | of any disability that you suffered from? |

*APEX Reporting*
(617) 426-3077

51

```
 1    A    No.
 2    Q    I believe that Item 4, in terms of the complaints that
 3         are covered by this particular lawsuit, has to do with
 4         delaying the processing of your workers comp claim?
 5    A    Yes.
 6    Q    Who was the person responsible for delaying the
 7         processing of the workers compensation claim?
 8    A    Oh, boy.  There's so many up there.
 9    Q    Let me, let me ask you the question -- let me withdraw
10         and ask it in a different way.  Who do you believe
11         discriminated against you in delaying the processing of
12         your workers comp claim?
13    A    I don't, I can't remember their name.  The only name
14         that comes to mind is Eleanor McNearny, but she not be
15         the one.  It may be, there's another, also, Greany.
16    Q    Linda Greany?
17    A    Yeah, I think it's Linda Greany.
18    Q    Does she have anything to do with workers comp claims?
19    A    Oh, no.  I'm sorry.  Workmens comp, I believe it's
20         Eleanor McNearny.
21                          (The document referred to was
22                           marked for identification as
23                           Poehler Exhibit No. 11.)
24              BY MS. GOODWIN:
25    Q    Your, your, the actual EEO complaint on this, which I
```

52

1    can show you as Exhibit 11, names three people as being
2    involved in all these various discrimination acts, one
3    of them being Jay Penna, one Al Hearn and one Michelle
4    Collins, and my question is which, if any, of those
5    individuals was the individual who you believe
6    discriminated against you with respect to the
7    processing of your workers comp claim?
8  A  Michelle Collins.  Michelle Collins, I believe -- I
9    talked to John Petrid on, on this particular, my OWCP
10   case.  She had, they didn't get back to us, and the
11   reason they didn't get back to us until a certain time
12   was because she went on vacation -- this is what she
13   told John.
14        She went on vacation, and the, all the stuff was
15   in the fax machine and nobody got it, so he asked to
16   see me.  He tried to tell me nobody has access to the
17   fax room, you know, so he del -- you know, I talked to
18   John, just said they're deliberately holding up your
19   workmens comp claim.
20 Q  He said that to you?
21 A  Yeah.  He says, you know--
22 Q  And who was deliberately holding up your workers comp
23   claim?
24 A  I believe it was Michelle Collins that was supposed to
25   get the paperwork or send it in, and what happened was,

53

| | | |
|---|---|---|
| 1 | | like I said, when she got back John, because it was |
| 2 | | over the due date, she said that it was, it was in the |
| 3 | | fax machine.  She went on vacation, and that's where it |
| 4 | | was.  It must have came, somebody faxed it and left it |
| 5 | | or they were looking for a fax, but it-- |
| 6 | Q | So was, do you believe that it was Michelle Collins who |
| 7 | | was discriminating against you? |
| 8 | A | Yes. |
| 9 | Q | And on what basis was she discriminating against you; |
| 10 | | was she retaliating against you-- |
| 11 | A | Well-- |
| 12 | Q | --for prior EEO complaints? |
| 13 | A | I can't answer that. |
| 14 | Q | How was she discriminating against you? |
| 15 | A | Well, tying, getting my OWCP out in a timely fashion. |
| 16 | | The excuse she gave to my rep at the time was, was it |
| 17 | | was on the fax machine and I was on vacation. |
| 18 | Q | Well, what's your belief as what the real reason was |
| 19 | | that she was delaying it? |
| 20 | A | I, I believe somebody upstairs talked to her and told |
| 21 | | her to, to slow up my claim. |
| 22 | Q | And who talked to her from upstairs to-- |
| 23 | A | I have-- |
| 24 | Q | --tell-- |
| 25 | A | I have no idea, but that's how they do things. |

54

1  Q   And so, if I'm following you, you don't know who talked

2      to her--

3  A   No--

4  Q   --to tell her to slow up the claim?  You -- and that's,

5      am I understanding you that it's your -- let me

6      withdraw that.

7          Other than believing that that's the way things

8      work, do you have any evidence that there was any

9      retaliation or discrimination involved in any delay in

10     the processing of your workers comp claim?

11 A   I, I had a claim that I brought up to workmens comp,

12     gave them a copy of what they didn't have.  They, in

13     turn, were supposed to send it to Boston.  I, in turn,

14     got a reply from Boston that it was untimely, and a

15     certain part of the claim was not, had not been

16     disclosed to them.

17         When I went upstairs to find out what they did

18     with that copy I gave them, because that was the

19     portion that workmens comp they didn't have, it wasn't

20     in my file, and I had, you know, I went up there and

21     handed it to them.  Now, that wasn't, it wasn't in my

22     file, so where'd it go?  You know, that's why I'm

23     saying.

24         Then, then this was delayed, so I told John about

25     the, that previous episode, and he says, I think

APEX Reporting
(617) 426-3077

1    they're just, you know, they're playing games with you,

2    so file an EEO, and so I did.

3  Q  And is there anything else--

4  A  But that's--

5  Q  --any other evidence--

6  A  No--

7  Q  --that's discriminatory?

8  A  No, other than that.

9  Q  Just go back to the interrogatories for a moment

10    because I think -- do you mind if I just take it for a

11    second?

12 A  No.

13 Q  I think the last one is, the last one listed in

14    response to Interrogatory No. 1 is being denied a

15    reasonable accommodation as of 02/13/02; do you see

16    that?

17 A  Yes.

18 Q  No. 5.  What was the accommodation you were denied?

19 A  The accommodation I was denied, my psychologist or

20    psychiatrist, Debra Reynolds, wrote a letter to my

21    manager, Al Hearn, requesting that I be removed from

22    the facility so I wouldn't have to work in that

23    environment.

24        Her suggestion was that I go to another facility

25    and work, another post office, in other words, and they

56

1    just said, well, that's just a recommendation, and they

2    put me in the Far East.   That's when they put me over

3    in the Far East.

4  Q  And did you indicate to Mr. Hearn that you were

5    satisfied with that move going to the East, BMC East?

6  A  At the time he did it, I said I'll give it a couple

7    weeks and see how, how this works out, but I believe

8    that she wants me out of the building, you know.

9        He said, well, she's just suggesting that.

10 Q  Were you moved out of the area that you had been in

11    before?

12 A  (No verbal response.)

13 Q  How far away--

14 A  Yeah, I--

15 Q  How far away were you moved?

16 A  I was moved into another area of the building.

17    There's, the way the building's structured, it's, it's

18    the BMC main plant; then, you go through another work

19    area which is considered the, the connector because it

20    connects the buildings, and at the end of that, that's

21    the Far East.

22 Q  So how long does it take you to walk from one part to

23    the part that, from the part you had been at previously

24    to the part you were reassigned?

25 A  Maybe four or five minutes.