United States District Court
District of Massachusetts

**DAVID F. POEHLER**
                  PLAINTIFF

    v.                            **CIVIL ACTION NO.** 04-30192-MAP

**JOHN E. POTTER, POSTMASTER GENERAL, USPS**
                  DEFENDANT

## MORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The plaintiff, David F. Poehler ("Poehler"), brings this action against John E. Potter, Jr., United States Postmaster General, under Title VII of the Civil Rights Act of 1964. The plaintiff opposes defendant's motion for summary judgment on the grounds that Poehler can show an adverse employment action and can demonstrate discriminatory motive. Therefore, the defendant is not entitled to summary judgment.

## RESPONSE TO LOCAL RULE 56.1 STATEMENT OP MATERIAL FACTS (WITH SUPPLEMENTAL FACTS)

1. At times relevant to the complaint, Poehler was employed by the United States Postal Service ("Postal Service") Tab A, Poehler Deposition 1,2 pp. 5—11.

Admitted.

2. In 1996, Poehler worked as a supervisor at the Chicopee Post Office. He resigned in December, 1996, following a disagreement with his supervisor. Tab A, pp. 12—13. After a failed business venture, Poehler returned to the Postal Service in 1997 as a clerk in the Springfield Bulk Mail Center ("BMC") supervised by Al Ream and Mark Sales. Tab A, pp. 22—23. The BMC manager, Robert Koestner, told Poehler he had to complete the Associate Supervisor Program ("ASP") if he wanted to become a supervisor. Tab A, p. 32. The ASP trains supervisors.

Admitted in part and denied in part. A review of the circumstances of Poehler's resignation, which occurred after harassment from his supervisor centering on Poehler's disability status, is necessary to view these facts in a light most favorable to the plaintiff as the non-moving party. A disability note from his physician dated October 17, 1996 indicates Poehler was disabled from work beginning October 11, 1996 and submitted a Doctor's note dated Ocotber 11, 1996,

indicating he was incapacitated until November 1, 1996. He subsequently supplied a noted from the Doctor indicating he was disabled "due to acute stress and depression." (Ex. 1) Despite these two notes, on October 24, 1996, Poehler's supervisor, Cathy Clark, proposed charges against Poehler based on his absence beginning October 11, 1996. (Ex. 2) On October 25, 1996, Supervisor Clark scheduled a "Fitness for Duty" exam for Poehler with the Post Office Medical Office. (Ex. 3) On October 29, 1996 Postal Medical Officer, Dr. Richard Brody, M.D. notified Ms. Clark that Poehler was not fit for duty, corroborating his disability. (Ex. 4) Poelher returned to work on November 12, 1996. (Ex. 5) By December 2, 1996 Poehler submitted his resignation citing "mental stress" as the reason. The resignation was signed by Ms. Clark. (Ex. 6) The above facts must be viewed in a light most favorable to Poehler as the non-moving party, and in conjunction with the timing and context of the statements by Robert Koestner upon Poehler's return to work eight months later, when he offered Poehler a return to his Supervisory position, and then, after Poehler consultation between Clark and Koestner, informed Poehler concerning the pre-textual grounds of ASP program participation as the basis for denying Poehler a return to a supervisor's position. A question of fact exists as to whether the ASP program was applicable to plaintiff (as evidenced by the list of other returning supervisor's not required to take the ASP exam set forth in Plaintiff's Answer to Interrogatory Number 1 in Civil Action No. 04-30254-MAP as well as deposition testimony by Poehler, p. 49- 50) (Attached here as Ex. 21)

> 3. Poehler worked as an acting supervisor from 1998 to 1999, when he chose to return to the clerk's job because his workload was too heavy. Tab A, pp. 26—27.

Admitted in part and denied in part. Poehler testified in his deposition that his return to a clerk's position after working as an "acting" supervisor (doing the supervisor's work for less pay) was precipitated by complaints by Poehler about excessive workload without sufficient help:

> "What caused me to go back as a clerk is Mark Sales and Al Hearn started getting rid of all the other supervisors or acting supervisors, and slowly but surely I was running the whole building, you know, I mean, which you end up with like 80 mail handlers and 24 clerks, and that on the overtime they'd call people on days off. I was running four or five areas, the docks, Sanvik sorter, the connector, the bundle sorters, and that was it. And I said, hey, you've got to get me help, I just - - got fatigued. I said look you ain't going to get me help, I can't keep doing this. So, finally I - - I just stepped down because it was just too much. . . . Al Hearn, I told him, I said, I got to - - I can't do this anymore.  . . . They didn't give me any help." (Depo p. 26-27)

Subsequently, in order to replace himself, the employer made Poehler train the ASP recruits in the program. (Depo 27) This is the same program that Koestner used as a pretext to prevent Poehler from returning to employment as a permanent supervisor. Poehler then found out that a co-worker, Suzanne Bowes, was promoted to a supervisory position in Springfield, Vermont, without taking the ASP test. This led to the first EEO complaint being filed by poehler in 1999. Subsequently, as set forth in Answers to Interrogatories (Ex. 21 - Number 1) Poehler later learned of other employees promoted or allowed to return to supervisory employment to the post office after a resignation, without ASP participation, and was not provided the encouragement, and support as other employees outside his protected class as far as age, sex, and disability, and

has suffered retaliation.

[1] The defendant accepts the facts as true for the purpose of this motion, reserving his right to challenge them at trial.
[2] Poehler's deposition took place on November 7, 2005, and January 20, 2006, and is referenced as Poehler I (Tab A) and Poehler II (Tab B)
[3] An acting supervisory position did not require completion of the ASP.
[4] Poehler was replaced as acting supervisor by Frank Landry. Tab A, p. 29. Landry then went through the ASP and became a permanent supervisor. Tab A, pp. 30—31.

    4.   In 1998, Poehler applied for the ASP but failed the admissions test. Tab A, p. 33, 39.

Admitted in part and supplemented. Based on other employees who resigned and returned as supervisors, without taking the ASP test, Poehler has suffered disparate treatment. (See Answer to Interrogatory Number 1 (Ex. 21) for list of names) In addition, others who have taken the test and failed have been treated differently as evidenced by the testimony of Poehler in his deposition that, after taking and failing the test for admission to the ASP program, all other employees who took the exam and failed were given another chance to take the exam, and were encouraged to do so:

> Everybody else got a chance to do it again and, well, were called in the office, and I got to be discouraged and I was the only one who wasn't called in the office, I didn't understand why I wasn't called in [by supervisory staff and]  . . .  were asked not to be discouraged, to take it again, you know, if they need help, you know, they were going to try to help them. (Poehler Depo p. 33-34)

Poehler testified that other employee's received e-mail notification concerning opportunities to take the ASP, (Poehler Depo 38) while, whenever he asked his supervisors about scheduling the test, they did not provide any assistance (Poehler Depo 37). The last time Poehler had any conversation with Koestner, Poehler inquired as to the ASP program and Koestner said, "I'm not going to tell you anything because the last time I talked to you I found myself in court" (Poehler Depo p. 50)

    5.   Poehler worked as a clerk from 1999 to 2001, and a bundle sorter from 2001 to 2004. In 2004, Poehler became an acting supervisor at the BMC in Springfield and transferred to a similar position at the BMC annex in Chicopee in 2005. Tab A, pp. 5-11.

Admitted.

    6.   On April 11, 2002, Poehler filed EEO Complaint 1B—0l2—0031—02 alleging disability discrimination and retaliation in connection with the following events: (1) not being made whole following the rescission of a letter of removal; (2) not allowing him to return to work until February 14, 2002, following the rescission of a letter of removal; (3) denying his request for sick leave on January 12, 2002; (4) not timely processing his worker's compensation claim; and (5) not providing a reasonable accommodation. Tab C, ¶ 21, an Lx. 20 thereto.

Admitted.

      7.      On June 25, 2004, the Postal Service issued its final decision denying Poehler's claim and notifying him of the right to file a lawsuit within 90 days. Tab C, ¶ 23, and Ex. 22 thereto.

Admitted.

      8.      The first allegation of EEO Complaint 1B—012—0031—02 related to the rescission of a February 9, 2002, letter of removal. Poehler complained that although the letter was rescinded, he was not "made whole." However, after filing a union grievance, Poehler was "made whole." Tab 6, pp. 43—45. Supervisor Alan Hearn handled the rescission of the letter of removal. Poehler testified that he did not believe that Hearn was discriminating against him on any basis on connection with this issue. Tab B, p. 47.

Admitted in part. This was the second time management had attempted to discipline Poehler based on attendance related issues revolving around his disability which he had previously complained about. (See EEO complaint 13—012—0034—01 Tab B, pp, 34—35) As indicated the Notice of Proposed Removal was dated January 4, 2002 and was signed by Hearn and Penna. (Ex. 7) As indicated on the Notice, it relates to incidents and absences dating from November 2001. This period of time correlates with Poehler's psychiatric assessment from Dr. Reynolds recommending a leave of absence due to his emotional problems. (Ex. 8) Poehler filed a claim with the Office of Workers' Compensation on January 9, 2002. (Ex. 9) Poehler filed a Union Greivance on January 14, 2002 (Ex. 10) On January 25, 2002 Al Hearn issued a decision indicating that the proposed removal was warranted and that he supported it. (Ex. 11) Dr. Reynolds faxed a report to Dr. Brody of the Post Office on January 31, 2002. (Ex. 12) Dr. Brody transmitted the information concerning Poehler's disability status and recommendation for a placement with different supervisors, and indicated he was available to answer questions. (Ex. 13) On January 31, 2002, Pohler complained to Human Resources that he had not heard anything concerning his Worker's Compensation claim. (Ex. 14) On February 2, 2002 Hearn authored a statement saying he "didn't remember" telling Poehler to "knock off the bullshit" when complaining that he was named in an EEO complaint. (15)

In the course of the grievance, the Union Steward filed a statement outlining Poehler's disability status and EEO complaint history (Ex. 16) The Union Greivance requested "Removal issued on 1/25/02 be rescinded without any further repercussions, expunged from all files, employee made whole."(Ex. 17) On February 9, 2002, Supervisor Penna "rescinded" the notice of removal without any further action as to the request that it be expunged or not be used against Poehler. (Ex. 18) As noted in Poehler's deposition testimony, without the additional requests being granted, he was not made "whole". (Depo 43-45) Further, Poehler was entitled to 30 days of paid administrative leave pending a removal under MSPB. The Union complained that Poehler was not made "whole" in this regard. (Ex. 19)

      9.      The second allegation of EEO Complaint 1B—012—0031—02 claimed that Hearn did not allow Poehler to return to work until February 14, 2002, following the rescission of the letter of removal. Poehler testified that he did not have

evidence to support his belief that Hearn's action was discriminatory. Tab 6, pp. 49—50.

Admitted in Part. While the return to work date is correct, As indicated the Notice of Proposed Removal was dated January 4, 2002 and was signed by Hearn and Penna. (Ex. 7) As indicated on the Notice, it relates to incidents and absences dating from November 2001. This period of time correlates with Poehler's psychiatric assessment from Dr. Reynolds recommending a leave of absence due to his emotional problems. (Ex. 8) Poehler filed a claim with the Office of Workers' Compensation on January 9, 2002. (Ex. 9) Poehler filed a Union Greivance on January 14, 2002 (Ex. 10) On January 25, 2002 Al Hearn issued a decision indicating that the proposed removal was warranted and that he supported it. (Ex. 11) Dr. Reynolds faxed a report to Dr. Brody of the Post Office on January 31, 2002. (Ex. 12) Dr. Brody transmitted the information concerning Poehler's disability status and recommendation for a placement with different supervisors, and indicated he was available to answer questions. (Ex. 13) On January 31, 2002, Pohler complained to Human Resources that he had not heard anything concerning his Worker's Compensation claim. (Ex. 14) On February 2, 2002 Hearn authored a statement saying he "didn't remember" telling Poehler to "knock off the bullshit" when complaining that he was named in an EEO complaint. (Ex. 15)

In the course of the grievance, the Union Steward filed a statement outlining Poehler's disability status and EEO complaint history (Ex. 16) The Union Greivance requested "Removal issued on 1/25/02 be rescinded without any further repercussions, expunged from all files, employee made whole."(Ex. 17) On February 9, 2002, Supervisor Penna "rescinded" the notice of removal without any further action as to the request that it be expunged or not be used against Poehler. (Ex. 18) As noted in Poehler's deposition testimony, without the additional requests being granted, he was not made "whole". (Depo 43-45) Further, Poehler was entitled to 30 days of paid administrative leave pending a removal under MSPB. Both Poehler and the Union complained that Poehler was not made "whole" in this regard. (Ex. 19)

On March 17, 2002, Poehler's Attorney, Mary Ann Lane complained that Poehler:

> had complained and filed grievances and EEO complaints was subjected to a hostile work environment by Management, who labeled him as a complainer and a troublemaker. The ongoing and relentless harassment and discriminatory treatment took a progressively more severe toll on Mr. Poehler's state of mind and well being, resulting in his development of major depression symptoms. Although Mr. Poehler continued to include the appropriate documentation in his medical unit file with the assistance of his non-attorney representative, union steward john Petrin, Mr. Poehler was given a seven day suspension, a fourteen day suspension and a notice of proposed removal. (Ex. 20)

10. The third allegation of the EEO Complaint 1B—012— 0031—02 addressed the denial of a request for sick leave on January 12, 2002. Poehler's supervisor at the time, Jay Penna, was responsible for the denial of sick leave. According to Poehler, Penna's actions were

not motivated by disability discrimination or retaliation but rather due to the fact that he had a letter of removal pending. Tab B, pp. 48—49.

Admitted in Part. As indicated the Notice of Proposed Removal was dated January 4, 2002 and was signed by Hearn and Penna. (Ex. 7) As indicated on the Notice, it relates to incidents and absences dating from November 2001. This period of time correlates with Poehler's psychiatric assessment from Dr. Reynolds recommending a leave of absence due to his emotional problems. (Ex. 8) Poehler filed a claim with the Office of Workers' Compensation on January 9, 2002. (Ex. 9) Poehler filed a Union Greivance on January 14, 2002 (Ex. 10) On January 25, 2002 Al Hearn issued a decision indicating that the proposed removal was warranted and that he supported it. (Ex. 11) Dr. Reynolds faxed a report to Dr. Brody of the Post Office on January 31, 2002. (Ex. 12) Dr. Brody transmitted the information concerning Poehler's disability status and recommendation for a placement with different supervisors, and indicated he was available to answer questions. (Ex. 13) On January 31, 2002, Pohler complained to Human Resources that he had not heard anything concerning his Worker's Compensation claim. (Ex. 14) On February 2, 2002 Hearn authored a statement saying he "didn't remember" telling Poehler to "knock off the bullshit" when complaining that he was named in an EEO complaint. (Ex. 15)

In the course of the grievance, the Union Steward filed a statement outlining Poehler's disability status and EEO complaint history (Ex. 16) The Union Greivance requested "Removal issued on 1/25/02 be rescinded without any further repercussions, expunged from all files, employee made whole."(Ex. 17) On February 9, 2002, Supervisor Penna "rescinded" the notice of removal without any further action as to the request that it be expunged or not be used against Poehler. (Ex. 18) As noted in Poehler's deposition testimony, without the additional requests being granted, he was not made "whole". (Depo 43-45) Further, Poehler was entitled to 30 days of paid administrative leave pending a removal under MSPB. The Union complained that Poehler was not made "whole" in this regard. (Ex. 19)

On March 17, 2002, Poehler's Attorney, Mary Ann Lane complained that Poehler:

> had complained and filed grievances and EEO complaints was subjected to a hostile work environment by Management, who labeled him as a complainer and a troublemaker. The ongoing and relentless harassment and discriminatory treatment took a progressively more severe toll on Mr. Poehler's state of mind and well being, resulting in his development of major depression symptoms. Although Mr. Poehler continued to include the appropriate documentation in his medical unit file with the assistance of his non-attorney representative, union steward john Petrin, Mr. Poehler was given a seven day suspension, a fourteen day suspension and a notice of proposed removal. (Ex. 20)

      11.    The fourth allegation of the EEO Complaint 1B—012—0031—02 addressed a delay by Michelle Collins in processing Poehler's worker's compensation form. Tab B, pp. 52-53. Collins explained to Poehler that the delay was due to the fact that she had been on vacation. Poehler did not believe that explanation and attributed the delay to discrimination. However, he

had no evidence of any discriminatory motive and simply assumed that someone "upstairs" had instructed her to delay processing the form. Tab B, pp. 53—54.

Admitted in Part. It was with the previously described background and environment that Poehler's claim for work related compensation benefits languished. Moreover, it was not until March 19, 2002 (more than 2 months after Poehler has submitted his stress claim to OWCP) that Cathy Clark submitted a statement concerning Poehler's allegations, which dated back to 1996 when he resigned after taking time off due to his emotional condition and suffering harassment by Clark. Poehler detailed the allegations in a statement submitted with his claim. (Ex. 3) These allegations also included Poehler's objection that Mark Forgue present at a pre-disciplinary meeting on April 28 2001 with Al Hearn and Union Steward Mancione, where Forgue (described as a "very good friend of Mike Mannix" who was dating Cathy Clark, was accusing him of fraud with regard to an injury" (Ex. 22).

       12.    The final allegation of EEO Complaint 1B—012—0031—02 alleged that the Postal Service failed to provide a reasonable accommodation for Poehler's mental disability. According to Poehler, his doctor recommended that he be transferred to a different building; instead he was transferred to another part of the same building. Tab 6, pp. 55—56.

Admitted.

## SUPPLEMENTAL FACTS SUBMITTED BY PLASINTIF

       1.    A more detailed outline of the basis for discrimination is contained in the statement attached as Exhibit A to Plaintiff's answers to interrogatories which is incorporated here. (Ex 23)

## ARGUMENT

### I.  The Summary Judgment Standard

A court must be "particularly cautious" about granting summary judgment when the state of mind of one of the parties is in issue. *Stepanischen v. Merchants Despatch Transportation Corp.,* 722 F.2d 922, 928 (1st Cir.1983) (*citing Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976)). However, the existence of a state of mind issue does not "automatically preclude summary judgment." *Id* at 929 The party opposing the motion must present some indication that "he can produce the requisite quantum of evidence" to entitle him to a trial. *Hahn,* 523 F.2d at 468; *Stepanischen*, 722 F.2d at 929 *Velazquez v. Chardon,* 736 F.2d 831, 833 (1st Cir.1984).

In cases involving an issue of intent, direct evidence of defendant's intent seldom exists. Before granting summary judgment, the court is required to determine "whether plaintiff could prevail if a jury or judge believed plaintiff's version of the facts and disbelieved defendant's version." *Stepanischen*, 722 F.2d at 929.

## II.    Poehler Suffered An Adverse Employment Action

As to Poehler's remaining claims, he can show that he suffered an adverse employment action, a prerequisite for a discrimination claim. *Marrero v. Goya of Puerto Rico, Inc.,* 304 F.3d 7, 22 (1st Cir. 2002) (*citing Hernandez—Torres v. Intercontinental Trading. Inc.,* 158 F.3d 43, 47 (1st Cir. 1998)). "To be adverse, an action must materially change the conditions of the plaintiff's employment." *Gu v. Boston Police Dept.*, 312 F.3d 6, 14 (1st Cir. 2002). Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting him, reducing his salary, or divesting him of significant responsibilities, *see Crady v. Liberty Nat. Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); *Connell v. Bank of Boston],* 924 F.2d [1169,] 1179 [ (1st Cir.1991) ], or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [him] for promotion after a particular period of service, *see, e.g., Hishon v. King & Spalding,* 467 U.S. 69, 75-76, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).*Blackie,* 75 F.3d at 725-26 (parallel citations omitted). Determining whether an employee has suffered a material adverse employment action "necessarily requires a case-by-case inquiry." *Id.* at 725 (citing *Welsh v. Derwinski,* 14 F.3d 85, 86 (1st Cir.1994); 2 LEX K. LARSON, EMPLOYMENT DISCRIMINATION, § 34.04 (2d ed.1994)).

Poehler's complaints do reach the level of severity necessary to be considered "adverse employment actions" as that phrase is defined under the law. The first allegation of EEO

Complaint 1B—012—0031—02 related to the rescission of a February 9, 2002, letter of removal. Defendant claims that although the EEO complaint asserted that Poehler was not "made whole," he acknowledged at his deposition that after he filed a union grievance, he was "made whole." Tab B, pp. 43—45.

On the contrary, this was the second incident of management attempting to remove Poehler for attendance issues related to his disability. The first incident, (See EEO complaint 13—012—0034—01 Tab B, pp, 34—35) March 15, 2001, is the subject to Poehler's other lawsuit, Civil Action No. 04-30254-MAP, and those facts should be considered here.

Moreover, as indicated the Notice of Proposed Removal was dated January 4, 2002 and was signed by Hearn and Penna. (Ex. 7) As indicated on the Notice, it relates to incidents and absences dating from November 2001. This period of time correlates with Poehler's psychiatric assessment from Dr. Reynolds recommending a leave of absence due to his emotional problems. (Ex. 8) Poehler filed a claim with the Office of Workers' Compensation on January 9, 2002. (Ex. 9) Poehler filed a Union Greivance on January 14, 2002 (Ex. 10) On January 25, 2002 Al Hearn issued a decision indicating that the proposed removal was warranted and that he supported it. (Ex. 11) Dr. Reynolds faxed a report to Dr. Brody of the Post Office on January 31, 2002. (Ex. 12) Dr. Brody transmitted the information concerning Poehler's disability status and recommendation for a placement with different supervisors, and indicated he was available to answer questions. (Ex. 13) On January 31, 2002, Pohler complained to Human Resources that he had not heard anything concerning his Worker's Compensation claim. (Ex. 14) On February 2, 2002 Hearn authored a statement saying he "didn't remember" telling Poehler to "knock off the bullshit" when complaining that he was named in an EEO complaint. (Ex. 15)

In the course of the grievance, the Union Steward filed a statement outlining Poehler's

disability status and EEO complaint history (Ex. 16) The Union Greivance requested "Removal issued on 1/25/02 be rescinded without any further repercussions, expunged from all files, employee made whole."(Ex. 17) On February 9, 2002, Supervisor Penna "rescinded" the notice of removal without any further action as to the request that it be expunged or not be used against Poehler. (Ex. 18) As noted in Poehler's deposition testimony, without the additional requests being granted, he was not made "whole". (Depo 43-45) Further, Poehler was entitled to 30 days of paid administrative leave pending a removal under MSPB. The Union complained that Poehler was not made "whole" in this regard. (Ex. 19)

The second allegation of EEO Complaint 1B—012—0031—02, that Hearn did not allow Poehler to return to work until February 14, 2002, following the rescission of the letter of removal, is also claimed to not rise to the level sufficient to be considered by a jury as an "adverse impact". As Poehler explained it at his deposition, "he gave me a date when I could come back to work instead of letting me come back right away." Tab 6, p. 49. According to Defendant, that issue does amount to a materially adverse change in the terms and conditions. However, it does involve loss of income. While not a large amount of money, the action amounts to the type of egregious and humiliating action sufficient to be the cause of his emotional distress described.

Similarly, the third and fourth allegations of the EEO Complaint 1B—012—0031—02, which address a denial of sick leave on January 12, 2002, and a delay in processing worker's compensation forms, also rise to the level of adverse employment actions as taking "something of consequence from the employee".

As stated in the March 17, 2002 letter from, Poehler's Attorney, Mary Ann Lane, Poehler had previously:

> complained and filed grievances and EEO complaints was subjected to a hostile work environment by Management, who labeled him as a complainer and a troublemaker. The ongoing and relentless harassment and discriminatory treatment took a progressively more severe toll on Mr. Poehler's state of mind and well being, resulting in his development of major depression symptoms. Although Mr. Poehler continued to include the appropriate documentation in his medical unit file with the assistance of his non-attorney representative, union steward john Petrin, Mr. Poehler was given a seven day suspension, a fourteen day suspension and a notice of proposed removal. (Ex. 20)

Finally, Poehler's claim that the Postal Service failed to provide a reasonable accommodation is similarly not trivial. Poehler sought an accommodation that would change, not only the physical location of his work place, but also his supervisors. This was a change advised by his physician. The report of Dr. Adler suggests this. (Ex. 24). Dr. Ramaswamy also does. (Ex. 25 ).  Dr. Reynolds recommends this. (Exs. 8 & 12) These notes are all communicated to the employer and the employer's on staff medical physician (Dr. Brody) communicates this suggestion to the Human Resources and indicates that he is available to answer questions.   (Ex. 13). Despite these facts, Poehler's supervisor and work setting was not accommodated, and, viewing the facts in a light most favorable to plaintiff, a reasonable juror could likely infer that this aggravated Poehler's  emotional distress.

Moreover, considering all of these incidents together under a totality of circumstances standard, with additional facts, in this case, plaintiff was subjected to adverse employment action. There is an ongoing loss of salary and benefits from the refusal to return him to his former position as a supervisor since June 6, 1999, where plaintiff complained to EEO about not being able to return to his supervisory position in 1997. Moreover, Plaintiff was denied overtime and holiday work during the Labor Day 2001 holiday weekend.  There was a loss of pay associated with this action when he was not allowed to work the Labor Day holiday. Moreover,

unlike other co-workers, Plaintiff has produced evidence to suggest that defendant has past him over for promotion (actually denied his old job and salary) and the employer placed pre-textual testing in his way as a roadblock to try and limit his return to his original supervisor status while other employees under similar circumstances, have not been subjected to such requirements. Thus, each such action, standing alone, was a material adverse employment action. When those actions are considered collectively with the long history of animosity, (including the groundless suspension and discharge letters) such allegations create triable issues of fact adequate to defeat defendants' motion for summary judgment at the level of severity necessary to be considered "adverse employment actions" as documented by medical records.

More specifically, Defendant argues that the March 15, 2001, notice of proposed removal was reduced to a seven-day suspension, while held in abeyance provided Poehler did not miss more than three days of work within a three month period. Medical records reveal this occurred at a time when Poehler was being treated for emotional distress. The December 15, 2000 records of Dr. PJ Ramaswamy, MD is a Disability Note re: back, elbow, and work related depression, and referral to a psychiatrist. The January 31, 2001 records of initial evaluation notes from Baystate Medical Center documents his condition. The March 11, 2001 records of Dr. Ramaswamy, MD include a report from Dr. Adler psychiatric evaluation prescribes a return to work under different supervisors or in different environment. By November 6 of 2001 the records of psychiatrist Diedre Reynolds, MD prescribe a medical leave of absence due to mental health concerns, with an indefinite time period.

Under the circumstances, the invocation of the suspension was groundless, despite its status as "in house" and, viewed in a light most favorable to Plaintiff, exacerbated his emotional distress, and led to a period of disability which does involve a loss of pay.

Similarly, Defendant trivializes the August 30, 2001, comment by Hearn about being named in an EEO complaint claiming it fails to meet the threshhold for an adverse employment action claiming Hearn's remark was "isolated, unremarkable and plainly insufficient to support a discrimination claim". Defendant refers to the fact that Hearn and Poehler had a social relationship as evidence. In fact, such evidence, viewed in a light most favorable to plaintiff, should, as a matter of common sense, should be considered "adverse". It is one thing to believe that people who you have no relationship with are treating you illegally, but the emotional distress would only be heightened when those who you trust appear to have turned against you. Accordingly, the actions complained of do constitute an adverse employment action.

### IV.  Poehler Can Establish A Prima Pacie Case of Discrimination

Defendant argues Poehler's complaint cannot survive summary judgment because he has no evidence that the Postal Service was acting with a discriminatory motive. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). " [T]he plaintiff must ordinarily do more than impugn the legitimacy of the employer's asserted justification; he must also adduce evidence 'of the employer's discriminatory animus'." *Vega v. Kodak Caribbean Ltd.*, 3 F.3d 476, 479 (1st Cir. 1993), *quoting Mesnick v. General Elec. Co.*, 950 F.2d 816 (1st Cir. 1991).

With respect to the failure to allow Poehler to return to work immediately following the rescission of his removal, defendant claims "there is no evidence of any discriminatory motive". Defendant refers to Poehler's deposition testimony that he did not believe that Hearn was discriminating against him on any basis on connection with this issue. Tab B, p. 47. Such a statement is taken out of context and contrary to the summary judgment standard that requires that all facts and inferences be viewed in a light most favorable to the non-moving party. A review of the Notice indicates that it was signed by Hearn and Penna, (Ex. 7) and that the

rescission was signed by Penna only. (Ex. 18) It may be that only Penna was retaliating against him or it may be that Hearn and Penna together were taken such action. Similarly, Poehler's deposition testimony that he "did not believe that the denial of sick leave was motivated by discrimination". Tab B, pp. 48—49 is improperly taken out of context. Poeher's subjective believes about discriminatory motive for the other actions is not generally admissible. A claim of retaliation is separate and distinct from other claims of discrimination. In fact, a litigant can prevail on the former even when the latter claim is dismissed. See *Bain v. Springfield,* 424 Mass. 758 (1997). Poehler's subjective impressions regarding the intent of one accused of discrimination are not proper items for consideration in arriving at verdict in a discrimination case. *Id.*

The evidence previously discussed may be relied upon as it is adequate to enable a rational factfinder reasonably to infer that discrimination was a determinative factor in the adverse employment action. *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1117 (1st Cir.1993).

A plaintiff should not be required to produce "smoking-gun" evidence before prevailing in a discrimination suit. Circumstantial evidence in this case such as comments Hearn denigrating Poehler for filing a complaint, shortly after filing his complaint, together with the incidence of differential treatment in the workplace, with regard to promotions without resort to the ASP program, provides evidence of discrimination which, as part of an aggregate package of proof offered by the plaintiff, meets the requirement of showing "pretext" sufficient to defeat summary judgment here. *Olivera v. Nestle Puerto Rico, Inc.,* 922 F.2d 43, 49, 50 (1st Cir.1990).

Further evidence of differential treatment is evidenced by the testimony of Poehler in his deposition that, after taking and failing the test for admission to the ASP program, all other

employees who took the exam and failed were given another chance to take the exam, and were encouraged to do so.

> Everybody else got a chance to do it again and, well, were called in the office, and I got to be discouraged and I was the only one who wasn't called in the office, I didn't understand why I wasn't called in [by supervisory staff and] . . . were asked not to be discouraged, to take it again, you know, if they need help, you know, they were going to try to help them. (Poehler Depo p. 33-34)

Poehler testified that other employee's received e-mail notification concerning opportunities to take the ASP, (Poehler Depo 38) while, whenever he asked his supervisors about scheduling the test, they did not provide any assistance (Poehler Depo 37). The last time Poehler had any conversation with Koestner, Poehler inquired as to the ASP program and Koestner said, "I'm not going to tell you anything because the last time I talked to you I found myself in court" (Poehler Depo p. 50) In light of these facts, summary judgment is not warranted. Particularly in light of the fact that Defendant's argument is based on an attack as to the credibility of Plaintiff's claims. Defendant brief cites the "constantly changing focus of Poehler's various EEO claims" as "a strong indication that the claims lack substance." Such arguments may be fodder for cross examination or argument to a jury, but should not be considered by the court at this stage of the proceedings in light of the other evidence.

Defendant claims that Poehler's claim involving Koestner relating to the ASP was based on Poehler's belief that Susan Bowes was promoted to a supervisory position without going through the training program, and that the fact that Poehler conceded that Bowes was hired in Vermont is an Koestner that Koestner had no involvement in her promotion. Tab A, pp. 48—50. However, there is no specific fact to show that Koestner had no involvement. In fact, considering Koestner's position, is defies common sense to think a en employee under him would obtain the

type of promotion she received in Vermont without input from Koestner.

Moreover, as Poehler testified in his deposition, his belief that Mr. Koestner has discriminated against him is not only based on the Suzanne Bowes employment decision, but is also based on the fact that an employee named Bill Crawley:

> "didn't like working at the Bulk Mail Center, was transferred over to West Springfield, didn't like West Springfield branch, quit, was gone for a total of 18 months, job he was at, private, fell through, and he called up Bob Koestner. Bob Koestner brought him back to West Springfield as a supervisor with no repercussion" (Poehler Depo p.50)

Similarly, the fact that Poehler, with regard to the March 15, 2001, notice of proposed removal to retaliation, only has knowledge that one of the four supervisors named in the complaint was aware that he had filed a previous EEO action, and that the prior EEO action was not against that supervisor, is a factual fish inappropriate for summary judgment. The fact that one of the four had knowledge should suffice. Tab B, pp. 21—25.

Defendant's claim that there is no temporal proximity between the June 1999 complaint and the proposed removal is irrelevant in light of the ongoing nature of discrimination. The medical records substantiate the causal connection with ongoing emotional distress with his supervisors, leading to a period of disability. Moreover, the litany of Poehler's complaints show ongoing continuous harassment. Under the circumstances, the facts demonstrate sufficient temporal proximity between the protected conduct and the employment action in this case to make out a prima facie case *Calero—Cerezo v. United States Department of Justice*, 355 F.3d 6 (1st Cir. 2004). Tab B, pp. 35- 37.

In sum, Poehler's circumstantial evidence surrounding the Postal Service's discriminatory motives is sufficient to defeat summary judgment.

## CONCLUSION

For the reasons stated above, the Plaintiff respectfully requests that the motion be denied.

                          Respectfully submitted,
                          Plaintiff

By:       __/s/ Edward M. Pikula_____
            Edward M. Pikula, Esq.
            BBO#399770
            O'CONNOR, MARTINELLI, CULLINAN & PIKULA
            1391 Main Street – Suite 1022
            Springfield, Massachusetts 01103
            Telephone:   (413) 781-5311
            Telefax:       (413) 727-2706

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered on this 14th day of May 2006.

                          /s/ Edward M. Pikula